State of Nebraska, appellee, v.
Joshua W. Nolan, appellant.
___ N.W.2d ___

Filed November 13, 2015.    No. S-15-106.

1. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

2. **Postconviction: Constitutional Law: Proof.** In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable.

3. **____: ____: ____.** A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution.

4. **Postconviction: Proof.** If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing.

5. **Constitutional Law: Effectiveness of Counsel.** A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.

6. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

7. _____: _____: _____. To show prejudice under the prejudice component of the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different.

8. **Proof: Words and Phrases.** A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

9. **Effectiveness of Counsel.** A court may address the two prongs of the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), test, deficient performance and prejudice, in either order.

10. **Postconviction: Effectiveness of Counsel: Appeal and Error.** A claim of ineffective assistance of appellate counsel which could not have been raised on direct appeal may be raised on postconviction review.

11. **Effectiveness of Counsel: Appeal and Error.** When analyzing a claim of ineffective assistance of appellate counsel, courts usually begin by determining whether appellate counsel actually prejudiced the defendant. That is, courts begin by assessing the strength of the claim appellate counsel failed to raise.

12. _____: _____. Counsel's failure to raise an issue on appeal could be ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.

13. _____: _____. When a case presents layered ineffectiveness claims, an appellate court determines the prejudice prong of appellate counsel's performance by focusing on whether trial counsel was ineffective under the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), test. If trial counsel was not ineffective, then the defendant suffered no prejudice when appellate counsel failed to bring an ineffective assistance of trial counsel claim.

14. **Trial: Prosecuting Attorneys.** Prosecutors are charged with the duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.

15. **Trial: Prosecuting Attorneys: Words and Phrases.** Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

16. **Trial: Prosecuting Attorneys.** Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

17. ____: ____. When a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. These types of comments are a major purpose of summation, and they are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness.

18. **Trial: Prosecuting Attorneys: Juries.** A distinction exists between arguing that a defense strategy is intended to distract jurors from what the evidence shows, which is not misconduct, and arguing that a defense counsel is deceitful, which is misconduct.

19. **Trial: Photographs.** If the State demonstrates that a police photograph in question is not unduly prejudicial and that it has substantial evidential value independent of other evidence, it is admissible.

20. ____: ____. Caution must be exercised when introducing police file photographs so that the defendant is not prejudiced by evidence of a prior contact with the police. In order to avoid such a prejudicial effect where the fact of a prior criminal record is not properly before the jury, the prosecution should avoid (1) use of such pictures in a form in which they may be identified as police pictures and (2) references in testimony to the files from which they were obtained.

21. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Joshua Nolan, pro se.

HEAVICAN, C.J., WRIGHT, CONNOLLY, McCORMACK, MILLER-LERMAN, CASSEL, and STACY, JJ.

Miller-Lerman, J.

## I. NATURE OF CASE

Joshua W. Nolan, the appellant, was convicted of first degree murder and use of a deadly weapon to commit a felony in connection with the killing of Justin Gaines. He was sentenced to a term of life imprisonment for the first degree murder conviction and a term of 10 years' imprisonment for the use of a deadly weapon to commit a felony conviction, to be served consecutively. On direct appeal, we affirmed Nolan's convictions and sentences. See *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012). On March 31, 2014, Nolan filed a pro se motion for postconviction relief. On January 21, 2015, the district court for Douglas County filed an order in which it denied the motion without holding an evidentiary hearing. Nolan appeals. We determine that the district court erred when it denied Nolan an evidentiary hearing on three of his claims, identified as A, B, and C, set forth in detail below, and we reverse the decision of the district court on these claims and remand the cause for an evidentiary hearing on these claims. In all other respects, we affirm the decision of the district court.

## II. STATEMENT OF FACTS

The events underlying Nolan's convictions and sentences involve the shooting killing of Gaines. Nolan was 19 years old at the time of the shooting. In our opinion regarding Nolan's direct appeal, we set forth the facts as follows:

> The events leading up to Gaines' death began on the morning of September 19, 2009, the day of the shooting. Joshua Kercheval testified that at around 11:30 a.m. that day, [Trevelle J.] Taylor and Nolan had shown up at his house and that Kercheval drove Taylor and Nolan around Omaha. Kercheval explained that Taylor asked him to drive, although Kercheval was not told where to go. Kercheval ended up driving them around town for roughly 30 minutes before deciding to drive to a gas station near 72d Street and Ames Avenue. Video

surveillance from the gas station places the three of them at the gas station from 1:21 to 1:30 p.m. Kercheval testified that when they left the gas station, he began driving back toward his house. But as they approached the intersection of 45th and Vernon Streets, Taylor told Kercheval to stop the car and Nolan and Taylor both got out. At that point, Kercheval parked the car and was sitting in the car texting on his telephone when he heard a number of gunshots.

Meanwhile, at around 1 p.m., Gaines had driven past a home near 45th Street and Curtis Avenue and had seen Catrice Bryson, a close family friend, in the driveway. Bryson was at the house visiting a friend and her baby, but had stepped outside to smoke a cigarette. Gaines pulled into the driveway, parked right behind Bryson's car, and greeted Bryson with a hug. Bryson and Gaines began talking; Gaines sat back in his car, on the driver's side, one foot in, one foot out, with the car door open. Bryson, standing with the open car door between her and Gaines, continued talking with Gaines for roughly 10 to 15 minutes. Toward the end of their conversation, Bryson went to get a pen from her car to give Gaines her telephone number.

When Bryson turned back around, she saw two individuals with guns behind Gaines' car and she heard shooting. The two shooters were on each side of Gaines' car, angled toward each other. Bryson described the shooter on the passenger's side of Gaines' car as a black male in his early twenties with a beard and goatee and shoulder-length hair in braids, wearing a "do-rag." Bryson identified the shooter on the passenger's side of Gaines' car as Nolan.

Gaines, while still sitting in the driver's-side seat of his car, was shot in the back. Once Gaines had been hit, the shooters made their escape, each fleeing in opposite directions on Curtis Avenue. At that point, Bryson began screaming for help. Several people responded, and the

police arrived quickly thereafter. Gaines was transported to a nearby hospital, but never regained consciousness and was pronounced dead.

Several eyewitnesses to the aftermath of the shooting testified at trial. Heather Riesselman, at the time of the shooting, lived close to the house where the shooting took place. On the day of the shooting, at approximately 1:40 p.m., Riesselman was outside on her porch with her daughter. At that time, Riesselman saw a young black man "jogging down the street." Riesselman described him as being roughly 5 feet 10 inches tall, medium build, medium complexion, with his hair in braids and with a long, thin goatee. Riesselman identified the man, in court, as Nolan.

Carrie Schlabs was Riesselman's next-door neighbor. At approximately 1:30 p.m. on the day of the shooting, Schlabs was at home with her husband and two friends when they heard gunshots and dove to the floor. Once the gunfire ceased, Schlabs heard screaming, so she got to her feet and ran out to her front porch. Once outside, Schlabs started running toward the screams on Curtis Avenue, to the south, and she saw a young man running to the north. Schlabs saw the young man holding his left side, which made her think that he had been shot. Schlabs ran up to him, getting to within a foot of him, and asked if he needed help. In response, the individual just smiled at Schlabs. At that point, Schlabs continued on toward the screams. While Schlabs could not remember any specific details of the young man's physical appearance or clothing, she remembered his face. Schlabs identified the man, in court, as Nolan.

Kercheval testified that after he had heard the gunshots, he had started the car, getting ready to drive off. But then Kercheval saw Nolan approaching the car and waited until Nolan jumped into the back passenger seat. Once Nolan was in the car, he told Kercheval to "Drive. Go." Kercheval said that he began driving toward

his house, but, at Nolan's direction, Kercheval dropped Nolan off near a school. Whether it was Nolan or Taylor who was dropped off near the school was in dispute. Kercheval's next thought was to "go dump the car." But before he was able to do so, he was arrested. Taylor was also arrested that day. Nolan, however, was not taken into custody that day.

Eight days after the shooting, Nolan, driving in his car, was pulled over for making an improper turn. The officers received identification for both the driver and the passenger. The officers knew that Nolan was associated with a local gang. Upon approaching the driver's-side door of the car, the arresting officer noticed bullet holes in the car. After running data checks on both the driver and the passenger, the officer saw that the Omaha police homicide unit had put out a "locate" for Nolan. A "locate" means that an officer wishes to speak with the individual, but it does not give the officers authority to arrest the individual.

At that point, the officer asked Nolan to get out of his car and stand near the back fender area. Instead, Nolan went past that area and sat on the curb. The officer observed that Nolan moved "[v]ery quickly" and was grabbing his waistband. The officer also observed that Nolan's pants were falling down and that it appeared as if there was something heavy in his pants. Finally, when asked if he had any weapons or other dangerous objects on his person, Nolan did not respond. The officer conducted a pat-down of Nolan, looking for weapons. The pat-down revealed a .44-caliber gun, found in Nolan's waistband. A subsequent search of Nolan's person uncovered live ammunition, and Nolan was placed under arrest at that time. The gun and ammunition were admitted into evidence at trial over objection.

Nolan was charged with one count of murder in the first degree and one count of use of a deadly weapon to commit a felony. Nolan filed several pretrial motions.

The motions relevant to this [direct] appeal are (1) a motion to suppress the gun and ammunition recovered from Nolan during the traffic stop, (2) a motion to suppress identifications of Nolan by Riesselman and Schlabs, and (3) a motion for the judge to recuse himself from the case. Each of these motions was denied. The case proceeded to a jury trial, and Nolan was convicted of both crimes. Nolan was then sentenced to a term of life imprisonment for the first degree murder conviction, and a consecutive term of 10 years' imprisonment for the use of a weapon conviction. Nolan appeals.

*State v. Nolan*, 283 Neb. 50, 53-56, 807 N.W.2d 520, 529-30 (2012).

Approximately 2 months after Gaines was killed, a gun was found that was that was later matched to some of the bullet casings that were found at the scene of the shooting. We wrote about the finding of this gun in *State v. Taylor*, 287 Neb. 386, 842 N.W.2d 771 (2014). Trevelle J. Taylor was also convicted of first degree murder and use of a deadly weapon to commit a felony in connection with Gaines' death. With respect to the gun that was found, we stated in *Taylor*:

The State also adduced evidence that more than 2 months after the shooting, [Joseph] Copeland's son found a gun hidden in the bushes or trees of a nearby school. The weapon was a semiautomatic 9-mm pistol. Three bullet casings recovered from the scene of the shooting were matched to the pistol.

287 Neb. at 390, 842 N.W.2d at 776.

The foregoing facts are also supported by the trial record in this case. Joseph Copeland testified that he called the police on November 27, 2009, because his son had found a gun at a school near his residence. Copeland testified regarding his son's informing him of finding a gun and the location thereof: "My son and his friend had been down at the school flying an airplane, and at some point they lost the airplane in the bushes, and they had went looking for it, and they had came across a pistol," and "he had brought it to the house and gave

it to me, and then we called the police and had them come pick it up." When asked if the son physically took Copeland to the area where the son had found the pistol, Copeland testified: "He did."

At the current trial, the State's firearms expert, Daniel Bredow, testified that a spent bullet retrieved from Gaines' body was a .44-caliber bullet, but it could not conclusively be linked to the gun found on Nolan. Bullets at the scene were fired from a .44-caliber weapon.

In our opinion in Nolan's direct appeal at which he was represented by counsel different from trial counsel, we restated and consolidated Nolan's assignments of error as follows:

[T]he district court erred in (1) denying [Nolan's] motion to suppress the gun and ammunition resulting from the traffic stop, (2) denying his motion to suppress the identifications of Nolan made by [Heather] Riesselman and [Carrie] Schlabs, (3) admitting the .44-caliber gun into evidence in violation of Neb. Evid. R. 403 and 404, Neb. Rev. Stat. §§ 27-403 (Reissue 2008) and 27-404 (Cum. Supp. 2010), (4) allowing a cellular telephone company employee to testify regarding telephone records, (5) denying his motion to recuse the trial judge, (6) giving a "step" jury instruction, and (7) concluding that the evidence was sufficient to sustain his convictions. Nolan, as his eighth assignment of error, also claims that he received ineffective assistance of counsel at trial.

*State v. Nolan*, 283 Neb. at 56, 807 N.W.2d at 530-31. We found no merit to any of Nolan's assignments of error on direct appeal.

With respect to the eighth assignment of error claiming ineffectiveness of trial counsel, we stated:

Nolan claims, consolidated and restated, that his trial counsel, who was different from appellate counsel, provided ineffective assistance in three respects, by failing to (1) file a motion to suppress evidence retrieved from the investigatory stop of Nolan's car, (2) object to prejudicial statements obtained through custodial

interrogation in violation of *Miranda*, and (3) consult and call a fingerprint expert or identification expert to rebut the State's testimony.

*State v. Nolan*, 283 Neb. 50, 74, 807 N.W.2d 520, 542 (2012).

With respect to Nolan's first and second claims of ineffective assistance of counsel, we determined that the record was sufficient to review the claims and that trial counsel's performance was not deficient. With respect to Nolan's third claim of ineffective assistance of counsel, we determined that the record was not sufficient to review this claim on direct appeal and declined to consider the claim at that time. We stated:

Nolan claims that trial counsel should have called expert witnesses in order to rebut aspects of the State's case. In particular, Nolan claims that trial counsel should have consulted with experts on fingerprint evidence and the reliability of eyewitness identification. But, while we know such rebuttal evidence was not presented at trial, the record does not establish whether trial counsel considered or explored such strategies, what may or may not have led trial counsel not to pursue the strategies, or what such experts would have said had they been retained and called to testify. In other words, from our review of the record, we cannot make any meaningful determination whether expert testimony beneficial to Nolan could have been produced or, if it could have, whether trial counsel made a reasonable strategic decision not to present certain evidence. The record is, therefore, not sufficient to adequately review these claims on direct appeal, and we decline to consider them at this time.

*State v. Nolan*, 283 Neb. at 76-77, 807 N.W.2d at 543. In the present postconviction action, Nolan repeated his allegations regarding trial counsel's assistance with respect to experts on eyewitness identification and fingerprints, as claims A and B respectively, but the district court did not hold an evidentiary hearing on these claims. Having found no merit to Nolan's

assignments of error on direct appeal, we affirmed his convictions and sentences.

On March 31, 2014, Nolan filed a pro se motion for postconviction relief. In his motion, Nolan alleged 14 claims of ineffective assistance of trial and/or appellate counsel, which he labeled "A" through "N." Nolan alleged that his trial and/or appellate counsel was ineffective for failing to

A. consult with and call an identification expert to rebut the State's case;

B. consult with and call a fingerprint expert to rebut the State's case;

C. call Gwendolyn Anderson to testify on behalf of Nolan;

D. object to prosecutor's remarks during closing arguments about the testimony of Joshua Kercheval;

E. consult with and call a firearms expert to rebut the State's case;

F. move for a rehearing of our opinion on direct appeal regarding the identifications of Nolan made by Carrie Schlabs and Heather Riesselman;

G. object to exhibits 169 and 170 presented by the State;

H. assign and argue on direct appeal that the handgun found in Nolan's possession 8 days after the murder was inadmissible under Neb. Rev. Stat. § 27-403 (Reissue 2008);

I. move for a rehearing of our opinion on direct appeal regarding the admissibility of the gun and ammunition found during the traffic stop and subsequent pat-down of Nolan 8 days after the murder;

J. object to the prosecutor's remarks during closing arguments regarding "defense counsel's job";

K. object on grounds of prosecutorial misconduct to the State's use of tainted identifications and testimony of Schlabs and Riesselman;

L. and M. object to Nolan's sentence of life without parole, which is unlawful under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); and

N. object to the State's presenting inadmissible hearsay evidence from Copeland as to where the 9-mm gun was found.

On January 21, 2015, the district court denied Nolan's motion for postconviction relief without holding an evidentiary hearing. With respect to Nolan's claims A through K and N, the district court determined that his motion should be denied because

> the allegations were raised and addressed in his direct appeal. In addition, these arguments relate to tactical or strategic decisions made by trial counsel which . . . Nolan is bound by and he is [sic] not made a requisite showing of how he may have been prejudiced by the decisions of trial counsel.

With respect to Nolan's claims L and M, the district court denied relief because Nolan was 19 years old at the time of the offense, and therefore was not entitled to relief under *Miller v. Alabama, supra*. Accordingly, the district court denied Nolan's motion for postconviction relief without holding an evidentiary hearing.

Nolan appeals.

### III. ASSIGNMENT OF ERROR

Nolan assigns that the district court erred when it denied his motion for postconviction relief without holding an evidentiary hearing.

### IV. STANDARD OF REVIEW

[1] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015).

### V. ANALYSIS

#### 1. Relevant Postconviction Law

We begin by reviewing general propositions relating to postconviction relief and ineffective assistance of counsel claims before applying those propositions to the claims alleged and argued by Nolan in this appeal.

[2] The Nebraska Postconviction Act, Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2008 & Cum. Supp. 2014), provides that postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his constitutional rights such that the judgment was void or voidable. *State v. Crawford*, 291 Neb. 362, 865 N.W.2d 360 (2015). Thus, in a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *State v. Crawford, supra*.

[3,4] A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution. *State v. Huston, supra*. If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing. *Id*.

[5-9] A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial. *State v. Crawford, supra*. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Crawford, supra*. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Huston, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine

confidence in the outcome. *Id*. A court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id*.

[10-13] A claim of ineffective assistance of appellate counsel which could not have been raised on direct appeal may be raised on postconviction review. *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015). When analyzing a claim of ineffective assistance of appellate counsel, courts usually begin by determining whether appellate counsel actually prejudiced the defendant. *Id*. That is, courts begin by assessing the strength of the claim appellate counsel failed to raise. *Id*. Counsel's failure to raise an issue on appeal could be ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *Id*. When a case presents layered ineffectiveness claims, we determine the prejudice prong of appellate counsel's performance by focusing on whether trial counsel was ineffective under the *Strickland* test. *Id*. If trial counsel was not ineffective, then the defendant suffered no prejudice when appellate counsel failed to bring an ineffective assistance of trial counsel claim. *Id*.

## 2. NOLAN'S CLAIMS FOR POSTCONVICTION RELIEF: CLAIMS A, B, AND C WARRANT AN EVIDENTIARY HEARING

In his motion for postconviction relief, Nolan alleged 14 claims of ineffective assistance of trial and/or appellate counsel, which he listed as claims A through N. The State concedes that reversal is warranted with respect to claims A, B, and C, and on appeal, the parties focus on claims J, G, E, and N. Accordingly, we consider Nolan's claims in this order.

As an initial matter, we note that the State indicates in its appellate brief that the district court erred when it denied Nolan's motion for postconviction relief without a hearing on claims A, B, and C. The State therefore concedes that reversal and remand for an evidentiary hearing should be ordered limited to claims A, B, and C. We agree with the State.

In claim A, Nolan alleges that his trial counsel was ineffective for failing to consult with and call an identification expert to rebut the State's case regarding the eyewitness identifications of Nolan as a shooter. In claim B, Nolan alleges that his trial counsel was ineffective for failing to consult with and call a fingerprint expert to rebut the State's case regarding the presence of Nolan's fingerprints found in the vehicle in which Nolan, Taylor, and Kercheval were riding just before the shooting occurred. In claim C, Nolan alleges that his trial counsel was ineffective for failing to call Anderson to testify on Nolan's behalf and that appellate counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness on direct appeal. Anderson's testimony would allegedly be at odds with the State's witnesses regarding, inter alia, what color clothing the shooter was wearing.

In our opinion in Nolan's direct appeal, we stated that the record was insufficient to evaluate the substance of Nolan's complaints, now identified on postconviction as claims A and B. See *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012). The record is still insufficient, and an evidentiary hearing is warranted. See *State v. Seberger*, 284 Neb. 40, 815 N.W.2d 910 (2012) (stating that district court erred when it failed to grant evidentiary hearing on counsel's ineffectiveness because, after declining to address claim on appeal due to insufficient record, we determined record was still insufficient to analyze claim on defendant's motion for postconviction relief). We also agree with the State that claim C warrants an evidentiary hearing. Based on the allegations in Nolan's motion for postconviction relief, the record in this case, and the applicable law, an evidentiary hearing is warranted on Nolan's claims A, B, and C. Thus, we determine that the district court erred with respect to claims A, B, and C, and we reverse the district court's ruling denying these claims without an evidentiary hearing and remand the cause for an evidentiary hearing on claims A, B, and C.

### 3. Nolan's Claims for Postconviction Relief:
### Claims J, G, E, and N

#### (a) Claim J: Prosecutor's Remarks During Closing
#### Regarding Defense Counsel Summation

In claim J, Nolan alleges that his trial counsel was ineffective for failing to object to the prosecutors' remarks regarding "defense counsel's job" made during closing arguments, because the comments amounted to prosecutorial misconduct, and that appellate counsel was deficient for not raising this issue on appeal. We determine that the comments were not improper and that the district court correctly rejected this claim without an evidentiary hearing.

During the State's initial closing argument, the prosecutor stated:

> So what do you have? What are the odds? Is this all just mere coincidence? I mean, is the defense going to get up here and do the smoke screens and mirrors. I assume he will. That's his job. That's what he's supposed to do. He will get up here and try to pick apart every inconsistency with every witness, and I concede to you that there are inconsistencies. There are going to be inconsistencies. It's human error.

During the State's rebuttal closing argument, a second prosecutor stated:

> Now, as [the other prosecutor] told you before she sat down, it's [defense counsel's] job to get up here and go through mirrors and smoke screens. And so what I'm going to do is go through everything he had to say to you and let you know how that's not what you heard. And I will tell you that our arguments are not evidence. Okay. You twelve collectively will make that decision. You twelve will talk about what you all remember hearing. You will have every single one of those exhibits with you. You will have the jury instructions with you. Closing arguments are designed to just let you know how we believe all the evidence fits together and whether

you collectively think it fits together in that same way. It's not evidence. So some of the things — and I'll point them out — that [defense counsel] said you will have to recall was not the evidence.

[14,15] We have stated that prosecutors are charged with the duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). Because prosecutors are held to a high standard for a wide range of duties, the term "prosecutorial misconduct" cannot be neatly defined. *Id*. Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Id*.

[16] Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *State v. Gresham*, 276 Neb. 187, 752 N.W.2d 571 (2008); *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007). It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id*.

In *State v. Barfield, supra*, during closing arguments, the prosecutor strongly insinuated that all defense lawyers are liars. We stated, inter alia, that the evidence in the case was not overwhelming and that the credibility of the witnesses was a key factor and that accordingly, "the implication that defense counsel was a liar, and by extension was willing to suborn perjury, was highly prejudicial when viewed in that context." *Id.* at 516, 723 N.W.2d at 315. We concluded that the prosecutor's remarks were misconduct and required a new trial.

[17,18] However, in *Dubray,* we stated:

[W]hen a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to

highlight the relative believability of witnesses for the State and the defense. These types of comments are a major purpose of summation, and they are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness.

So a distinction exists between arguing that a defense strategy is intended to distract jurors from what the evidence shows, which is not misconduct, and arguing that a defense counsel is deceitful, which is misconduct.

289 Neb. at 227, 854 N.W.2d at 604-05.

In this case, the prosecutors made statements during closing arguments that the defense counsel was going to use "smoke screens and mirrors" to point out inconsistencies in the evidence. These statements, when read in context, constituted an argument by the State that defense counsel was intending to divert the jurors' attention from what the State believed the evidence showed and to point out inconsistencies in the evidence. The prosecutors' statements, when read in context, did not assert that defense counsel personally or defense lawyers generally are deceitful, nor did the prosecutors state that it is the job of defense counsel generally to mislead the jury. Accordingly, we determine that the prosecutors' remarks made during closing arguments were not improper and therefore were not prosecutorial misconduct.

Following our examination of the record, we determine that given the absence of prosecutorial misconduct, trial counsel was not deficient, and that therefore, appellate counsel was not deficient for not claiming error on appeal. The district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

### (b) Claim G: Exhibits 169 and 170

In claim G, Nolan alleges that his trial counsel was ineffective for failing to object to exhibits 169 and 170 and that appellate counsel was ineffective for not raising this

claim of ineffectiveness on appeal. We determine that the district court correctly rejected this claim without an evidentiary hearing.

Exhibits 169 and 170, which are black-and-white photographs of Nolan, were offered by the State. In exhibit 169, Nolan was facing toward the camera, and in exhibit 170, Nolan was facing away from the camera. Nolan asserts that exhibits 169 and 170 are mugshot photographs taken in connection with a prior arrest and that the admission of the photographs was improper and prejudicial because they implied to the jury that Nolan had prior contact with the police or had been arrested and/or convicted of prior crimes.

[19,20] We have previously stated that a police photograph is admissible to show the reasonableness of a witness' identification that the defendant and the person depicted are the same, but such a photograph is not admissible simply to prejudice the jurors by suggesting to them that the defendant has a prior criminal record. See *State v. Birge*, 215 Neb. 761, 340 N.W.2d 434 (1983). If the State demonstrates that the police photograph in question is not unduly prejudicial and that it has substantial evidential value independent of other evidence, it is admissible. See *id*. However, caution must be exercised when introducing police file photographs so that the defendant is not prejudiced by evidence of a prior contact with the police. *Id*. In order to avoid such a prejudicial effect where the fact of a prior criminal record is not properly before the jury, the prosecution should avoid (1) use of such pictures in a form in which they may be identified as police pictures and (2) references in testimony to the files from which they were obtained. See *id*.

Exhibits 169 and 170 were not prejudicial. There was no indication at trial that they are mugshots or police pictures. The attire does not signal the clothing of an incarcerated person. The photographs do not look like traditional mugshot photographs; in the photographs, Nolan is standing in front of a wall with wood paneling and there are no writings, numbers, or other insignia in the photographs that would indicate that

Nolan is under arrest. Furthermore, there was no testimony at trial that exhibits 169 and 170 were taken in connection with a prior arrest. Even if the jury had speculated that the photographs were mugshots, as urged by Nolan, there would be no basis for the jury to conclude that the photographs were taken in connection with a prior arrest instead of the current arrest for the crimes at issue in this case, and the photographs had independent value regarding, inter alia, eyewitness descriptions of the shooter.

Nolan's trial counsel was not deficient for not objecting to the photographs, and therefore, appellate counsel was not deficient for not claiming error on appeal. The district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

### (c) Claim E: Firearms Expert

In claim E, Nolan alleges that his trial counsel was ineffective for failing to consult with and call a firearms expert for the purposes of rebutting the State's evidence to the effect that some of the bullets recovered from the scene of the shooting were consistent with having been fired from a .44-caliber gun, such as the .44-caliber gun found in Nolan's possession. Nolan further alleges that appellate counsel was deficient for not raising this issue on appeal. Nolan asserts that if his trial counsel had obtained a firearms expert, the expert could have rebutted the State's evidence and perhaps distinguished the gun found in Nolan's possession from a gun capable of firing the bullets found at the scene of the shooting. The district court correctly rejected this claim without an evidentiary hearing.

The premise of Nolan's argument and Nolan's speculation regarding the usefulness of a firearms expert's testimony are belied by the record. The record shows that Bredow, the State's expert, testified that some of the bullets found at the scene were consistent with having been fired from a .44-caliber gun, such as the .44-caliber gun found in Nolan's possession.

However, Bredow testified that there was not enough evidence to determine that any of the bullets found at the scene were in fact fired from the particular gun found on Nolan. According to Bredow's testimony, the evidence regarding the .44-caliber gun found in Nolan's possession was inconclusive and did not directly tie Nolan to Gaines' murder.

Because the evidence regarding the .44-caliber gun found in Nolan's possession was inconclusive and did not tie Nolan to Gaines' murder, the scope and potential for rebutting Bredow's testimony was limited. There is not a reasonable probability that Nolan would have been acquitted if a firearms expert had been obtained by Nolan. Therefore, Nolan was not prejudiced by trial counsel's decision to not obtain a firearms expert. The records and files in this case affirmatively show that Nolan was entitled to no relief on this claim. Trial counsel's conduct was not deficient, and appellate counsel was not deficient for not claiming error on appeal. We affirm this portion of the district court's order.

### (d) Claim N: Copeland's Testimony

In claim N, Nolan alleges that his trial counsel was ineffective for failing to make a hearsay objection to Copeland's testimony regarding the location where his son found the 9-mm gun which was later connected to the shooting of Gaines and that appellate counsel was deficient for not raising this issue on appeal. Even though Copeland's testimony was inadmissible hearsay, we determine the district court correctly rejected this claim without an evidentiary hearing, because admission of the testimony was harmless.

At trial, Copeland testified about how his son notified Copeland of the location of the 9-mm pistol which was found by his son months after the shooting. Copeland testified in part:

> [Prosecution:] After September 19th of 2009, did you then have the occasion to call officers out to your residence on November 27th of 2009?
>
> [Copeland:] We did.

Q. And was that at approximately 12:30 in the afternoon?

A. Yes.

Q. And do you recall on that day whether there was any snow on the ground or anything like that?

A. There was none, no.

Q. And what — why did you call the police to your residence?

A. My son and his friend had been down at the school flying an airplane, and at some point they lost the airplane in the bushes, and they had went looking for it, and they had came across a pistol, and —

. . . .

A. — he had brought it to the house and gave it to me, and then we called the police and had them come pick it up.

Q. And did your son physically take you to the area where he found the pistol?

A. He did.

Q. And can you, using Exhibit 119, show the jury where your son took you?

A. This corner house right here (indicating), on the backside of the house, there's some bushes and stuff that set right along the edge of the street, and it was approximately two to three feet off the street in some bushes. About right here (indicating).

Nolan alleges that Copeland's testimony regarding where his son found the gun was inadmissible hearsay. The State concedes that the testimony is inadmissible hearsay but contends its admission was harmless.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2008). A "statement" for hearsay purposes includes "nonverbal conduct of a person, if it is intended by him as an assertion." § 27-801(1). Under Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2008),

hearsay is not admissible unless a specific exception to the hearsay rule applies. The State does not argue that Copeland's statement fell within any of these exceptions.

Copeland's statement concerning the location where the 9-mm gun had been found as conveyed by the out-of-court statement of his son should have been objected to and should not have been admitted. Copeland did not personally find the gun. Copeland knew the precise location at which the gun was found only because of his son's conduct, which was an assertion by the son as to where the gun was found. See, similarly, *State v. Taylor*, 287 Neb. 386, 842 N.W.2d 771 (2014) (determining that Copeland's similar testimony regarding location where his son found 9-mm pistol was inadmissible hearsay).

[21] However, the State maintains that the admission of Copeland's testimony regarding how he learned of the gun and where the gun was found was harmless error. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. See *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

We determine that the admission of Copeland's testimony concerning the location where the 9-mm gun was found was harmless error. The 9-mm gun was not found in Nolan's possession, and there was no direct evidence that he had been in possession of this gun. Nolan's guilt was established in this case by other relevant evidence, including eyewitness testimony, Kercheval's testimony, video footage from the gas station, and Nolan's fingerprints in the vehicle that Nolan, Taylor, and Kercheval had been in just before the murder, and the guilty verdict against Nolan was surely unattributable to the error in admitting Copeland's hearsay testimony.

The records and files in this case refute Nolan's allegation that his trial counsel was ineffective for failing to object

to Copeland's testimony. Furthermore, the allegations sur-
rounding this case do not demonstrate a violation of Nolan's
constitutional rights. The record shows that Nolan was not
prejudiced by trial counsel's conduct, and appellate counsel
was not deficient for not claiming error on appeal. Therefore,
the district court did not err when it denied relief without an
evidentiary hearing on this claim. We affirm this portion of the
district court's order.

### 4. Claims D, F, H, I, K, L, and M

#### (a) Claim D: Prosecutor's Remarks During Closing Regarding Kercheval's Testimony

In claim D, Nolan alleges that his trial counsel was ineffec-
tive for failing to object to remarks the prosecutor made during
closing arguments regarding Kercheval's testimony. During
closing arguments, the prosecutor stated:

> I mean, let's call a spade a spade here. [Kercheval is]
> not giving you full disclosure. He's not going to sit here
> and tell you what they're saying word for word. These
> were his friends. He's charged with a crime. You think he
> wants to seal the deal for this defendant? He knows what
> he's capable of. He gave you just enough that's consistent
> with what he said from the beginning to Detective Tramp
> over and over again. But he's not giving you everything
> [that was] said in that car.

Nolan alleges that these comments constituted prosecutorial
misconduct and that his trial counsel was ineffective for failing
to object to them and appellate counsel was ineffective for not
raising this issue on appeal. The district court correctly rejected
this claim without an evidentiary hearing.

As stated above, generally, in assessing allegations of pros-
ecutorial misconduct in closing arguments, a court first deter-
mines whether the prosecutor's remarks were improper. *State
v. Gresham*, 276 Neb. 187, 752 N.W.2d 571 (2008); *State
v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disap-
proved on other grounds, State v. McCulloch*, 274 Neb. 636,
742 N.W.2d 727 (2007). It is then necessary to determine the

extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id*. As we have noted above, "when a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and *to highlight the relative believability of witnesses for the State and the defense*." *State v. Dubray*, 289 Neb. 208, 227, 854 N.W.2d 584, 604 (2014) (emphasis supplied).

In this case, during closing arguments, the prosecutor made statements regarding Kercheval's credibility that were based on the evidence and the inferences that could be drawn therefrom. These comments were not improper and did not constitute prosecutorial misconduct. In this regard, we note that defense counsel also made comments regarding Kercheval's credibility during closing arguments and suggested that Kercheval had lied to the police and had lied to the jury at trial. Defense counsel also made comments to the effect that Kercheval lacked credibility because he had an incentive to cooperate with the State in exchange for a reduced sentence on his pending charges.

Because both parties challenged the credibility of Kercheval, the record refutes Nolan's allegation that his trial counsel was deficient for failing to object to the prosecutor's remarks made during closing arguments regarding Kercheval's credibility or that he was prejudiced by this alleged failing. Thus, appellate counsel was not deficient for not claiming error on appeal. Nolan is entitled to no relief on this claim. The district court did not err when it denied postconviction relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

### (b) Claim F: Rehearing Regarding Identifications

In claim F, Nolan alleges that his appellate counsel was ineffective for failing to move for a rehearing of our decision in Nolan's direct appeal. See *State v. Nolan*, 283 Neb.

50, 807 N.W.2d 520 (2012). Nolan contends that our opinion was incorrect because it misstated the facts surrounding the identifications made before trial by Schlabs and Riesselman and that thus, we incorrectly determined that the identifications made by Schlabs and Riesselman did not need to be suppressed and were admissible.

Our opinion on Nolan's direct appeal reflected a synthesis of several somewhat inconsistent versions of the testimony surrounding the identifications. Our description on direct appeal was supported by testimony. More important, the argument Nolan implies is that the identification procedure was unduly suggestive. We discuss this issue below in connection with claim K, wherein we reject the claim of an unduly suggestive procedure. In *State v. Nolan, supra*, we rejected Nolan's argument, and upon our further review of the records and files in this case, we determine that Nolan's argument that these identifications should not have been admitted is without merit. At the trial of this matter, it was for the finder of fact to determine the weight to be accorded to the witnesses' identifications.

Another challenge to the admissibility of the identifications would not have succeeded on rehearing. Because a motion for rehearing on this issue would not have yielded a different result, appellate counsel was not deficient for not so moving. The district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

### (c) Claim H: Admissibility
### of the .44-Caliber Gun

In claim H, Nolan alleges that his appellate counsel was ineffective for failing to vigorously argue on direct appeal that the .44-caliber gun found in Nolan's possession 8 days after the murder of Gaines was inadmissible under § 27-403 for the reason that its admission was unfairly prejudicial. Section 27-403 generally provides that relevant evidence may be excluded if its probative value is substantially outweighed

by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Nolan recognizes that his appellate counsel raised this issue on direct appeal, but he asserts that his appellate counsel failed to sufficiently argue the issue.

We have reviewed the record in this case, including the appellate arguments made on direct appeal, and we determine that the issue of the admissibility of the .44-caliber gun under § 27-403 was adequately raised and considered, and properly decided on direct appeal. See *State v. Nolan, supra*. The fact that appellate counsel did not persuade us is not to be equated with deficient performance. We determine that the records and files in this case affirmatively show Nolan was entitled to no relief on this claim and that Nolan has failed to allege any facts in his motion which, if proved, constitute an infringement on his constitutional rights. The district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

### (d) Claim I: Rehearing Regarding Motion to Suppress .44-Caliber Gun

In claim I, Nolan alleges that his appellate counsel was ineffective for failing to move for a rehearing of our decision on direct appeal because, according to Nolan, we incorrectly determined that the trial court properly denied Nolan's motion to suppress evidence of the .44-caliber gun found in Nolan's possession. Nolan asserts that our opinion was in error because it misstated the facts surrounding the evidence adduced in connection with the motion to suppress and that thus, we made an incorrect determination based on incorrect facts. Specifically, Nolan contends our opinion incorrectly stated that there was evidence that Nolan was affiliated with a gang and reasoned that this affiliation justified the pat-down that resulted in the discovery of the .44-caliber gun on Nolan's person.

The records and files in this case refute Nolan's allegation. We have reviewed the record in this case. The record shows

that Nolan's conduct and lack of cooperation after exiting the vehicle justified the pat-down, quite apart from the fact that one of the officers believed that Nolan was affiliated with a gang. In our opinion on direct appeal, we described Nolan's conduct after exiting the vehicle, in part, as "grabbing his waistband," having "something heavy in his pants," and moving very quickly. *State v. Nolan*, 283 Neb. 50, 55, 807 N.W.2d 520, 530 (2012). We continue to believe that the trial court properly denied the motion to suppress evidence of the .44-caliber gun discovered during the traffic stop and pat-down as we previously concluded. A motion for rehearing on this issue would not have yielded a different result, and appellate counsel was not deficient for not so moving.

The record shows that Nolan was not entitled to relief on this claim, and Nolan has failed to allege any facts in his motion which, if proved, constitute an infringement of his constitutional rights. The district court did not err when it denied relief on this claim without holding an evidentiary hearing. We affirm this portion of the district court's order.

### (e) Claim K: Prosecutorial Misconduct
### Regarding Identifications

In claim K, Nolan alleges that his trial counsel was ineffective for failing to object to the identifications of Nolan made by Schlabs and Riesselman on the grounds of prosecutorial misconduct. Nolan asserts that it was improper for the prosecution to allow both Schlabs and Riesselman to attend the meeting (initially set for only Riesselman) at which the identifications were made. Nolan argues that the procedures followed at the meeting resulted in both Schlabs and Riesselman making tainted identifications and that the procedures amounted to prosecutorial misconduct. This issue of the identifications made by Schlabs and Riesselman was raised and rejected on direct appeal. See *State v. Nolan, supra*.

We have reviewed the record and believe the steps taken by the prosecution to separate the witnesses as they made their identifications before trial were timely, effective, and proper.

Based on the reasoning set forth in our opinion on direct appeal, we determine that the facts surrounding the identifications made by Schlabs and Riesselman did not constitute prosecutorial misconduct. Nolan's claim that trial counsel was deficient for failing to object to the identifications based on prosecutorial misconduct is refuted by the record, and appellate counsel was not deficient for not claiming error on appeal. The district court did not err when it denied relief without an evidentiary hearing with respect to this claim. We affirm this portion of the district court's order.

### 5. CLAIMS L AND M: *MILLER V. ALABAMA*

In claims L and M, Nolan claims that his trial counsel was ineffective for failing to object to his sentence of life without parole and that his appellate counsel was ineffective for not raising this issue on direct appeal. Nolan argues that because he was only 19 years old at the time of the crime, his sentence of mandatory life imprisonment without the possibility of parole is improper under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Although *Miller* was decided after Nolan's direct appeal was concluded and we have held it is to be applied retroactively, see *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014), *cert. denied* ___ U.S. ___, 135 S. Ct. 67, 190 L. Ed. 2d 229, the holding in *Miller* would not afford Nolan relief. The district court correctly rejected this claim without an evidentiary hearing.

*Miller* generally held that mandatory life sentences without the possibility of parole for persons under 18 years old at the time they committed their offense were unconstitutional. Specifically, *Miller* provides that "mandatory life without parole for those *under the age of 18 at the time of their crimes* violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 132 S. Ct. at 2460 (emphasis supplied). In *State v. Wetherell*, 289 Neb. 312, 855 N.W.2d 359 (2014), we determined that *Miller* applies only to those persons who were under the age of 18 at the time of their crimes. In *Wetherell*, we determined that *Miller* did not apply

to the appellant therein who was 18 years old at the time of her crime.

In the present case, Nolan was 19 years old at the time of Gaines' murder, and accordingly, because he was not under the age of 18 at the time of the crime, *Miller* does not apply to him. Nolan has failed to allege facts in his motion which, if proved, constitute an infringement on his constitutional rights, and the records and files show that he is entitled to no relief. Trial counsel was not deficient for not raising this issue with the sentencing court, and appellate counsel was not deficient for not claiming error on appeal. The district court did not err when it concluded that Nolan was not entitled to relief under *Miller* and denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

## VI. CONCLUSION

The district court erred when it denied Nolan relief without an evidentiary hearing on three claims: claim A, that trial counsel was ineffective for failing to consult with and call an identification expert to rebut the State's case; claim B, that trial counsel was ineffective for failing to consult with and call a fingerprint expert to rebut the State's case; and claim C, that trial counsel was ineffective for failing to call Anderson to testify on Nolan's behalf and that appellate counsel was deficient for not raising this issue on direct appeal. We reverse the decision of the district court on these three claims and remand the cause for an evidentiary hearing on these claims. In all other respects, the decision of the district court is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.